ELECTRONICALLY FILED
Benton County Circuit Court
Brenda DeShields, Circuit Clerk
2016-Nov-02 14:32:16
04CV-16-1655
C19WD05 : 13 Pages

## IN THE CIRCUIT COURT OF BENTON COUNTY, ARKANSAS
## CIVIL DIVISION

**PAMELA HILL**                                                                           **PLAINTIFF**

**v.**                               **Case No. _____**

**TEVA PHARMACEUTICALS USA, INC., and**
**TEVA BRANDED PHARMACEUTICAL**
**PRODUCTS R&D, INC.**                                      **DEFENDANTS**

## COMPLAINT

Comes now, Plaintiff, Pamela Hill, by and through her attorneys William F. Clark and Andrew D. Curtis of Davis, Clark, Butt, Carithers & Taylor, PLC, and for her causes of action against the Defendants, Teva Pharmaceuticals USA, Inc., and Teva Branded Pharmaceutical Products R&D, Inc., states and alleges as follows:

1. Plaintiff, Pamela Hill (hereinafter "Hill"), files this Complaint for personal injury against the Defendants, Teva Pharmaceuticals USA, Inc., and Teva Branded Pharmaceutical Products R&D, Inc. (collectively "Defendants"), as a result of having a defective Paragard Intrauterine Device (IUD), which is researched, manufactured, merchandised, advertised, promoted, labeled, analyzed, tested, distributed, packaged, marked, and sold by Defendants, as more fully described herein.

## JURISDICTION AND VENUE

2. Venue is proper in this judicial district pursuant to Ark. Code Ann. § 16-60-101, in that a substantial part of the event giving rise to the cause of action occurred in Benton County, Arkansas, along with the fact that Hill resided in Benton County, Arkansas at the time the event giving rise to the cause of action took place.

3. Subject matter jurisdiction is proper in this Court pursuant to Ark. Const. Amend. 80, § 6(A), in that the circuit courts are the trial courts of original jurisdiction of all justiciable matters not otherwise assigned pursuant to the Arkansas Constitution.

## PARTIES

4. Pamela Hill, Plaintiff, is a resident of Benton County, Arkansas.

5. Separate Defendant, Teva Pharmaceuticals USA, Inc., is a Pennsylvania Corporation whose principal office is located at 425 Privet Road, Horsham, Pennsylvania 19044. Its Registered Agent is Corporate Creations Network Inc., which is located at 1001 State St., #1400, Erie, Pennsylvania, 16501.

6. Separate Defendant, Teva Branded Pharmaceutical Products R&D, Inc., is a Delaware Corporation, with its principal place of business at 425 Privet Road, Horsham, Pennsylvania 19044. Its Registered Agent is Corporate Creations Network Inc., which is located at 3411 Silverside Rd. #104 Rodney Building, Wilmington, Delaware 19810.

## FACTS

7. At all times pertaining to the facts provided herein, the Defendants, through their employees and agents, designed, researched, manufactured, labeled, packaged, promoted, marketed, and sold Paragard Intrauterine Devices.

8. At all times pertaining to the facts provided herein, the Defendants engaged in promoting and advertising Paragard Intrauterine Devices.

9. Defendants knew, or had reason to know, the Paragard Intrauterine Device (hereinafter "Paragard IUD") could cause serious harm to individuals that used their products, including perforation, intrauterine pregnancy, ectopic pregnancy Wilson Disease, vaginal bleeding, septic abortion, pelvic infection, embedment, dyspareunia, expulsion, and vaginitis, among other complications and risks.

10. Despite Defendants knowledge of these potential complications and risks created by the Paragard IUD, each of which could cause serious bodily injury and damage, Defendants failed to adequately warn consumers or remedy the defects in the product which made it unsafe.

11. On August 8, 2008, Hill underwent a procedure to have a 10-year Paragard IUD inserted, specifically Paragard IUD, ECR #1918NDC51285-204-01, as a form of contraceptive.

12. Prior to the expiration of the 10-year device, Hill began experiencing multiple serious medical conditions and complications for an extended amount of time, including, but not limited to back pain, urinary frequency and urgency, menstrual irregularities, unexpected weight gain, vaginal odor and vaginal discharge. As a result of the conditions experienced by Hill, she was left with no choice but to consult with her physician on June 11, 2015. Upon examination, the doctor noted that the Paragard IUD was extruding out of the external cervix and clearly not in the proper location.

13. In the doctor's opinion, the Paragard IUD could not be relied upon for birth control and was the likely cause for vaginal odor and other symptoms experienced by Hill. As a result, the doctor recommended removal of the Paragard IUD.

14. In an initial procedure to remove the Paragard IUD, the device failed and broke apart as the doctor was attempting to withdraw it.

15. Because of the broken and failed Paragard IUD, the doctor then recommended an immediate operative hysteroscopy with attempted removal of the Paragard IUD. This surgical procedure carried with it multiple risks including, but not limited to, uterine perforation and hemorrhage, among others.

16. During the operative hysteroscopy, the doctor removed the long axis portion of the Paragard IUD, and was able to retrieve approximately half of the "T" portion of the device; however, the other half of the "T" portion broke off, as it had already migrated and become embedded in Hill's cervical wall.

17. In light of the clear failure of the Paragard IUD, its migration, embedment and shearing, Hill's physician sent a request for information to Defendants regarding the Paragard IUD and Hill's medical situation. Defendants, in a continuing course of intentional, negligent and/or reckless behavior, failed to provide any guidance or instruction with respect to their defective device and instead merely responded by saying it was the doctor's decision as to how to remove the embedded device without it causing further damage and bodily injury to Hill.

18. Due to the plastic shards of the Paragard IUD remaining in Hill's body, there were significant long-term risks of infection and/or perforation, which could lead to more severe complications. Because of this, the doctor recommended removing the remaining shards of the Paragard IUD via hysterectomy.

19. In the months following the operative hysteroscopy, Hill experienced significant anxiety and depression, heightened blood pressure, pelvic pain, urinary incontinence, and dysfunctional uterine bleeding.

20. Hill sought a second opinion with respect to the broken Paragard IUD and consulted with an obstetrician/gynecologist who performed an ultrasound. The ultrasound clearly and unequivocally noted the presence of the broken, defective Paragard IUD and remaining shards. Hill's OB-GYN also discussed with her the serious complications with the defective Paragard IUD including how the embedded shards could migrate and cause significant issues and he, too, recommended removal of the Paragard IUD shards via hysterectomy.

21. The hysterectomy procedure carried multiple risks, including, but not limited to, bleeding, infection, internal injuries, persistence of pain, need for further surgeries, incontinence, nerve damage, dyspareunia, and others. Hill had no plans to have a hysterectomy and did not want a hysterectomy due to the risks it carried. However, she was left with no choice because of the defective, broken Paragard IUD.

22. Ultimately, following the advice of her physicians, on December 30, 2015, a hysterectomy was performed on Hill in order to surgically remove the remaining Paragard IUD shards. Hill suffered significant pain and suffering as a result of the hysterectomy, and remained hospitalized for three days, followed by three weeks at her home recovering, while being precluded from working for eight weeks.

23. The Paragard IUD was marketed heavily by Defendants as a safe and effective form of birth control. Defendants downplayed the risks associated with the Paragard IUD and withheld important safety information from potential customers and treating physicians.

24. The labeling and warnings provided for the Paragard IUD were inadequate, uninformative, and incomplete to alert physicians and potential customers of the risks associated with this product. Specifically, this includes inadequate labeling on the products produced, marketed, and distributed by Defendants.

25. Hill relied upon the representations provided by the Defendants, including their inadequate warnings and overstatements regarding the quality and safety of their products, and had the Paragard IUD inserted because of Defendants' representations that it was a safe and dependable product.

26. Due to Hill's use of the Paragard IUD, she developed significant health problems and was forced to undergo multiple operative procedures, including an invasive surgery. Furthermore, Defendants caused Hill further damage including, but not limited to, physical pain and suffering, mental anguish, loss of enjoyment of life, medical expenses and related monetary losses, and risk of further medical complications.

27. Defendants knew of the hazards associated with the Paragard IUD. However, Defendants purposefully concealed information that clearly demonstrated the dangers associated to the Paragard IUD, and misled potential consumers and physicians regarding the information that was distributed about the device.

28. Defendants concealed information regarding the risks of the Paragard IUD in order to persuade physicians to promote their products and convince individuals to have the product inserted in their bodies. The Defendants knew, or should have known, that their statements, representations and marketing tactics regarding the Paragard IUD were deceptive, false, incomplete, and/or misleading.

6

## COUNT I: PRODUCTS LIABILITY–NEGLIGENCE

29. Defendants are engaged in the business of designing, manufacturing, assembling, labeling, advertising, selling, and distributing the Paragard IUD.

30. Defendants had a duty to use ordinary care in its design and in the selection of the materials used in the Paragard IUD in order to protect those who would use the product from unreasonable risk of harm while it is being used for its intended purpose.

31. Defendants supplied the Paragard IUD in a defective condition that rendered it unreasonably dangerous.

32. Hill used the Paragard IUD as a birth control method, which resulted in significant pain and suffering, along with invasive surgery to remove the broken shards of the Paragard IUD that were unable to be removed after the device failed.

33. The Paragard IUD was in a defective condition and was the proximate cause of the harm and damages sustained by Hill.

34. Defendants are liable for damages caused to Hill under Ark. Code Ann. § 16-116-101, et. seq.

## COUNT II: PRODUCTS LIABILITY–FAILURE TO WARN

35. Defendants did not adequately warn of particular risks that were known or knowable at the time of manufacture and distribution.

36. Defendants had a duty to give a reasonable and adequate warning of dangers reasonably foreseeable regarding the use of the Paragard IUD.

37. However, the warnings provided on the label were inadequate, unclear, incomplete, and ambiguous. Hill and her physicians would have been required to formulate multiple assumptions

7

as to the risks of the product in order to understand that the Paragard IUD could begin to fail, migrate, break apart, and become embedded in her body causing her to have a hysterectomy.

38. Defendants' warning label was misleading and inadequate in that it did not provide the risks and dangers associated with embedment and perforation.

39. Because of the inadequate warning to Hill and her doctors, Hill sustained major bodily injury beyond what was to be possible or expected from the information provided on the warning label.

40. Defendants' failure to warn Hill of the risks and dangers associated with the product was a proximate cause of her injuries and damages. If Hill had been warned of the dangers associated with the Paragard IUD, she would have chosen a safer birth control method and avoided all risks and injuries associated with Defendants' device.

41. The information provided by Defendants regarding the Paragard IUD is incomplete and ambiguous, as the risks lead directly to other major problems that where not mentioned on the warning label.

## COUNT III: PRODUCTS LIABILITY-STRICT LIABILITY

42. Defendants were in the business of designing, testing, manufacturing, labeling, advertising, selling, and distributing the Paragard IUD.

43. The Paragard IUD was supplied by Defendants in a defective condition which rendered it unreasonably dangerous in that the Paragard IUD was dangerous to an extent beyond what could have been contemplated by a reasonable buyer.

8

44. Specifically, Defendants' product was defective and created an unreasonably dangerous condition in that the Paragard IUD malfunctioned during the normal use of the product and within the time frame the product was advertised to be effective.

45. Hill sustained damages as a result of having the Paragard IUD inserted in her body. Specifically, Hill suffered perforation of the uterus and embedment requiring invasive surgery and removal of the broken Paragard IUD via hysterectomy.

46. The insertion, migration, and subsequent removal of the Paragard IUD were the proximate and actual causes of Hills injuries, as well as the defective condition of the Paragard IUD.

47. Defendants are liable for damages caused to Hill under Ark. Code Ann. § 16-116-101, et. seq.

## COUNT IV: PRODUCTS LIABILITY–DESIGN DEFECT

48. Defendants were in the business of designing, testing, manufacturing, labeling, advertising, selling, and distributing the Paragard IUD.

49. Defendants have a duty to place their products in the stream of commerce that are safe to be used by the public.

50. Hill had the Paragard IUD inserted to be used as a form a birth control and the product malfunctioned during its normal and appropriate use.

51. The Paragard IUD was defective when it was distributed by the Defendants and inserted into Hill by her doctor. The defect existed at the time it left the control of Defendants.

52. The injuries, wounds, and damages alleged herein were the direct and proximate result of the design defect that existed in the Paragard IUD.

## COUNT V: PRODUCTS LIABILITY-MANUFACTURING DEFECT

53. Defendants were in the business of designing, testing, manufacturing, labeling, advertising, selling, and distributing the Paragard IUD.

54. Defendants have a duty to place their products in the stream of commerce that are safe to be used by the public and Defendants breached that duty.

55. The Paragard IUD was used as a birth control method and malfunctioned during its normal and proper use.

56. The Paragard IUD was defective when it left the manufacturer. Hill sustained damages as a result of having the Paragard IUD inserted in her body. Specifically, Hill suffered perforation of the uterus and embedment requiring invasive surgery and removal of the broken Paragard IUD via hysterectomy.

57. The injuries, wounds, and damages alleged herein were the direct and proximate result of the manufacturer defect that existed in the Paragard IUD.

## COUNT VI: MISREPRESENTATION

58. Defendants were in the business of designing, testing, manufacturing, labeling, advertising, selling, and distributing the Paragard IUD.

59. Defendants have a duty to place their products in the stream of commerce that are safe to be used by the public and Defendants breached that duty.

60. Defendants breached that duty when they advertised and promoted the Paragard IUD knowing that it was defective and could cause serious health problems.

61. Representations were made in literature distributed to consumers and physicians regarding the Paragard IUD and it being a safe and effective product. These representations were

made with the intention of convincing consumers to use their products without regard for the dangers it presented to the public, and specifically Hill.

62. Hill believed the Paragard IUD would be a safe and effective form of birth control.

63. Hill was injured as a result of having the Paragard IUD inserted.

64. Hill's injuries and damages were proximately caused by the misrepresentations made by Defendants regarding the Paragard IUD.

## DAMAGES

65. As a direct and proximate cause of Defendants' conduct, Pamela Hill has endured pain, suffering, and mental anguish and will continue to endure damages in the future.

66. Specifically, due to the conduct of Defendants, Pamela Hill underwent a hysterectomy in order to remove the broken shards of the Paragard IUD which required three days in the hospital and eight weeks of recovery, during which time she was unable to work; she also experienced intense and painful menstruation, vaginal discharge and odor, back pain, urinary frequency and urgency, and unexpected weight gain prior to the hysterectomy.

67. Pamela Hill is entitled to recover from the Defendants for the following:

   a. The nature, extent, duration, and permanency for the injuries she sustained;

   b. The reasonable expenses of all past medical care, treatment, and services as a result of the treatment of the injuries relevant to this action;

   c. The reasonable expenses of all future medical care, treatment, and services as a result of the treatment of the injuries relevant to this action;

   d. The pain and suffering experienced by Pamela Hill in the past as a result of the Defendants' conduct;

  e. The pain and suffering reasonably probable to be experienced by Pamela Hill in the future as a result of Defendants' conduct;

  f. The past mental anguish experienced by Pamela Hill as a result of Defendants' conduct;

  g. The mental anguish suffered and reasonably probable to be suffered in the future by Pamela Hill;

  h. The scars, disfigurement, and visible results of Pamela Hill's injuries; and

  i. All other damages afforded under Arkansas law and/or deemed applicable by this Court.

68. By reason of the above damages being proximately caused by the negligent conduct of the Defendants, Pamela Hill is entitled to recover from the Defendants, each of them jointly and severally, a sum greater than the Federal Court jurisdictional limits for diversity suits.

## PUNITIVE DAMAGES

69. Defendants knew, or should have known, in light of the surrounding circumstances, that its conduct would naturally and probably result in injury and/or death and it continued such conduct in reckless disregard of the consequences from which malice may be inferred.

70. Based on the conduct alleged above, Pamela Hill prays for punitive damages against the Defendants in an amount sufficient to punish it for its recklessness and deter the Defendants and others from similar conduct.

## JURY TRIAL

71. Pamela Hill demands that all issues be tried before a jury.

72.     Pamela Hill reserves the right to amend this Complaint including, but not limited to, additional counts and facts supportive of compensatory and/or punitive damages claims as discovery develops.

WHEREFORE, premises considered, the Plaintiff, Pamela Hill, prays for judgment against Defendants, Teva Pharmaceuticals USA, Inc., and Teva Branded Pharmaceutical Products R&D, Inc., jointly and severally, in an amount in excess of that required by federal diversity jurisdiction, on all counts provided herein, together with interest, attorneys' fees, and costs, and all other relief deemed proper by the Court.

Respectfully submitted,

PAMELA HILL

By: /s/ Andrew D. Curtis
   Andrew D. Curtis          #2014036
   DAVIS, CLARK, BUTT, CARITHERS
      & TAYLOR, PLC
   19 E. Mountain Street
   P.O. Box 1688
   Fayetteville, AR 72702
   Telephone: (479) 521-7600
   Facsimile: (479) 521-7661
   acurtis@davis-firm.com